Washington Trust Company of Pittsburgh, Pa. v. Commissioner.
Washington Trust Co. v. Commissioner
Docket No. 106307.
United States Tax Court
1942 Tax Ct. Memo LEXIS 116; 1 T.C.M. (CCH) 5; T.C.M. (RIA) 42566; October 26, 1942
*116 Charles H. Sachs, Esq., 1124 Frick Bldg., Pittsburgh, Pa., for the petitioner. J. Harrison Miller, Esq., for the respondent. DISNEY
Memorandum Findings of Fact and Opinion DISNEY, J.: This proceeding involves the redetermination of a deficiency in income tax for 1938 in the amount of $805.90. The issue is whether the respondent erred in disallowing as a deduction a loss of $4,884.25 alleged to have been sustained upon the sale of bonds of the American Commonwealth Power Corporation. The facts set forth in a stipulation of facts are found as stipulated. Material portions thereof will be set forth in the findings of fact made from other evidence. The petitioner filed its return for the taxable year with the collector for the twenty-third district of Pennsylvania. Findings of Fact Petitioner, a Pennsylvania corporation, with its principal place of business in Pittsburgh, Pennsylvania, is a trust company as defined in section 104 of the Revenue Act of 1928. In 1930 petitioner purchased at a cost of $4,895.50 five $1,000 face value 6 per cent convertible gold debentures of the American Commonwealth Power Corporation (hereinafter referred to as the corporation), maturing March 1, 1940. *117 In 1932 the corporation was forced into bankruptcy and in 1934 the court approved a plan of liquidation and distribution of the corporation's assets, which plan provided for the organization of a new company known as the Commonwealth Distribution, Inc. (hereinafter referred to as the new corporation), with a capital of 225,000 shares of a par value of $1 each. The new corporation acquired substantially all of the assets of the corporation and the creditors of the corporation, including the holders of its debenture bonds, were until November 6, 1937, given the privilege of exchanging their bonds for capital stock of the new corporation. All of the stock of the new corporation which was not exchanged in accordance with the plan of liquidation was sold on November 8, 1937, by court order and the net cash proceeds of sale were deposited in a bank where the holders of outstanding bonds of the corporation could surrender their securities and receive therefor their pro rata share of the fund amounting to $5 less certain expenses for each $1,000 face amount of bonds surrendered. Petitioner did not surrender the five bonds it held and did not receive its pro rata share of the cash proceeds *118 of sale. Petitioner's president did not know that petitioner could surrender the bonds prior to November 6, 1937, and receive therefor capital stock of the new corporation, or that thereafter it could surrender the bonds and receive its pro rata share of the proceeds of the stock of the new corporation which was not exchanged for bonds of the corporation. He made no inquiries to ascertain such rights. Petitioner in compliance with specific orders of the Secretary of Pennsylvania's Department of Banking, who had supervision of banks in the Commonwealth of Pennsylvania, charged off the bonds it held to reserve for depreciation of securities, as follows: February 27, 1932
$4,295.50
July 22, 1932
500.00
May 5, 1933
37.50 The remaining book value of the bonds was $62.50. The amounts charged off were not at any time claimed as a deduction from gross income. The net income of petitioner, excluding non-taxable interest and dividends, the tax reported thereon and the net income and tax thereon determined by the Commissioner for the years 1932 to 1937, inclusive, were as follows: Net Income
Reported (After
Adjusted by
Exclusion of Non-Taxable
Tax
Bureau Audit
Tax
Year
Interest and Dividends)
Reported
Taxable Income
Determined
1932
$ 5,728.85 (Loss)
None
$ 488.71
$ 67.20
1933
106,176.00 (Loss)
None
No change
None
1934
15,311.46 (Loss)
None
2,348.90
322.97
1935
8,701.48
$1,196.45
8,983.31
1,235.21
1936
8,052.33 (Loss)
None
No change
None
1937
2,049.20 (Loss)
None
No change
None
*119 In 1938 the charge-offs made in 1932 and 1933 were restored to the books so as to disclose the original cost of $4,895.50 of the bonds. In 1938 petitioner sold the bonds through Carl M. Loeb, Rhoades & Company, members of the New York Stock Exchange, to Strauss Brothers of New York, receiving therefor $2.25 for one bond sold on August 31, a like amount for one bond sold on September 1, and $6.75 for the three bonds sold on September 3. The sales were made to establish a loss for income tax purposes. Carl M. Loeb, Rhoades & Company bought and sold many blocks of securities for petitioner in 1938 and other years. All of petitioner's transactions in bonds were handled by its president. The order for the sale of the bonds in question was given by petitioner's president. He had no understanding with the purchaser of the bonds and did not know to whom the bonds would be sold. He did not ascertain the name of the purchaser until statements for the sales were received from the brokers. At the time of giving the selling order for petitioner he had no understanding with the brokers that he would want them to purchase like bonds for him individually or for anyone else. The president of petitioner *120 purchased through Carl M. Loeb, Rhoades & Company with his own funds, at the price indicated, five bonds of the issue, as follows: August 29, 1938, one bond
$ 5.00
August 30, 1938, one bond
5.00
September 2, 1938, three bonds
15.00 With the exception of the securities purchased on August 29, the bonds delivered to the purchaser were bonds previously sold by petitioner. The purchaser paid to the brokers the taxes and regular commissions on the purchases. At the time he gave the brokers a purchase order for his own account, petitioner's president had no understanding with the brokers that he would have them sell like bonds for the account of another. The purchase price paid by petitioner's president for the bonds has never been refunded to him. He had no understanding with petitioner with reference to the purchase of bonds if petitioner sold the bonds it held, and did not know from whom the broker had purchased the bonds until he received sales slips from them. On November 21, 1938, the purchaser donated the bonds to the petitioner, receiving nothing therefor. The minutes of the board of directors of petitioner contain the following resolution, adopted by the board on November *121 21, 1938: Whereas Mr. W. C. McEldowney has offered to give to the Trust Company $5,000.00 American Commonwealth Power Corporation Conv. Deb. 6% Bonds, due March 1, 1940 without cost, be it resolved that the said offer be accepted and the Trust Company extend to Mr. McEldowney its appreciation for his generous act. Petitioner subscribes for the Wall Street Journal; Standard Statistics, and Poor's Manual. Petitioner's president knew nothing about the financial condition of the American Commonwealth Power Corporation and did not know in 1938 the reason for the low value of the bonds. The bonds are still in the possession of petitioner. It has never tried to collect anything on them. The difference of $4,884.25 between the cost and selling price of the bonds was charged off by the petitioner in 1938 and claimed as a loss in its return for that year. The respondent disallowed the loss as a deduction upon the ground that the bonds became worthless in 1937. Opinion We have here a question as to whether certain bonds became worthless in 1937, as determined by the Commissioner in the deficiency notice, or whether the petitioner suffered a loss by the sale thereof in 1938, as petitioner *122 contends. The respondent having determined worthlessness in 1937, the burden is upon the petitioner to overcome presumptive correctness therof. In our opinion petitioner has failed so to do. The bonds had been issued by a company which went into bankruptcy in 1932 and as to which the court in 1934 approved a plan for the reorganization and a new company, the stock of which could be secured by exchanging the bonds of the former company. This could be done until November 6, 1937. The petitioner did not make such exchange. On November 8, 1937, the stock of the new corporation, which up to November 6, 1937, could have been received in exchange for the former bonds, was sold and the net cash proceeds were deposited in a bank, to be paid to the holder of the old bonds pro rata upon surrender of the old bonds. Thus it is seen that the old bonds as such ceased to exist on November 8, 1937, and the petitioner and the other holders of old bonds merely had a right to participation in the cash in the bank. That right was to receive $5.00 "less certain expenses for each $1,000.00 bond surrendered." (The stipulation, the only evidence as to this fact, is perhaps uncertain, reading "Petitioner's *123 pro rata share of said cash proceeds was the sum of $5.00 less certain expenses for each $1,000.00 bond surrendered." Though a possible construction would be that this means $1.00 per bond, we think the more reasonable construction is that it means $5.00 per bond - less expenses - and we so hold.) What was the amount of such expenses per bond? The record before us wholly fails to disclose. Such expenses may have been more, or may have been less, than $5.00 per bond and therefore there may have been nothing whatever to pay to a holder of such bonds. The president of petitioner bank as a witness, asked with reference to whether the bonds had been turned in, answered that they had not been, that "we haven't tried to collect anything on them, it is too trifling." Obviously, all of this indicates that at most the value of each $1,000 bond, on November 8, 1937, became worth an amount that was truly "trifling," less than $5.00 per bond, if indeed anything at all remained. It is entirely reasonable to think that the expenses upon a $1,000 bond might well have been more than $5.00. Even without considering the deduction of such expenses from the $5.00, the value was one-half of 1 per cent *124 of the face value of each bond. Such an approximation of zero in value sustains a determination of worthlessness. Whether anyone would have paid so much does not appear. These bonds since May 5, 1933, had a book value of only $12.50 per bond, since, after the charge-off made under the order of the Pennsylvania Department of Banking on that date the book value of the five bonds was only $62.50. This represents 1.25 per cent per bond. The president of the petitioner testified that at the time of the markdown (in 1932 - 1933), "We didn't think they had very much value at the time, but we never knew whether they might come back." The Commissioner apparently treated the matter as one of loss, rather than bad debt, since he merely determined that the "bonds became worthless" in 1937. Though in general bonds represent debt, the bonds here in question had in 1937 ceased to be such, there no longer was a definite promise to pay at a certain time - the ordinary attributes of debt - but after November 8, 1937, petitioner had only a right to share in a fund under a court's orders, and subject to expenses. This right, under the Commissioner's determination, was worthless. Under the evidence adduced, *125 we think petitioner has failed to prove otherwise. Moreover, though there is evidence that the president of the petitioner corporation knew nothing of the necessity for turning in the bonds by November 6, 1937, or the conversion of bonds to a right to participate in a fund under the orders of a court, there is no proof that proper legal notice thereof had not been served upon the bank itself. In other words, there is no proof that the petitioner corporation did not have knowledge during 1937 of worthlessness, whether of indebtedness represented by bond, or of its right to participate in a fund under court order, i.e., there is no proof that the petitioner in 1937 did not ascertain worthlessness of its rights. We conclude and hold that the petitioner has failed to show that its rights did not, as determined by the respondent, become worthless in 1937. That a very small amount ($11.25 for the five bonds) was paid for them in 1938, and whether such sale was bona fide is therefore immaterial. ; ; ; *126 affd., ; certiorari denied, ; . Therefore, Decision will be entered for the respondent.